# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 24-0605V

| | |
|---|---|
| BONNIE MCCLELLAND, | Chief Special Master Corcoran |
| Petitioner, | |
| v. | Filed: April 30, 2025 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*John Robert Howie, Howie Law, PC, Dallas, TX,* for Petitioner.

*Dorian Hurley, U.S. Department of Justice, Washington, DC,* for Respondent.

### DECISION AWARDING DAMAGES[1]

On April 18, 2024, Bonnie McClelland filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine received on September 16, 2022. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters, and although entitlement was conceded in Petitioner's favor, the parties could not agree to damages, and their dispute was therefore submitted to resolution at a "Motions Day" proceeding on April 30, 2025.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

**For the following reasons, I find that Petitioner is entitled to compensation in the form of a lump sum payment of $105,000.00 (for past pain and suffering).**

## I. Procedural History

The case was assigned to SPU in July 2024. ECF No. 10. In October 2024, Respondent conceded entitlement of Petitioner's SIRVA in a Rule 4(c) Report (ECF No. 15); and I issued a Ruling on Entitlement (ECF No. 17).

Petitioner also reported that damages could not be informally resolved (ECF No. 16), so the parties promptly set forth their respective positions. Brief filed Oct. 22, 2024 (ECF No. 19); Respondent filed Dec. 6, 2024 (ECF No. 22); Reply filed Dec. 22, 2024 (ECF No. 27); *see also* Joint Status Report filed Mar. 24, 2025 (ECF No. 29) (confirming that Petitioner was only seeking an award of pain and suffering, and that the parties were amenable and available for an expedited ruling).

At the end of the April 30, 2025 expedited hearing, I issued an oral ruling from the bench on damages in this case. That ruling is set forth fully in the transcript from the hearing, which is yet to be filed on the case's docket. The transcript from the hearing is, however, fully incorporated into this Decision.

## II. Authority

In another recent decision, I discussed at length the legal standard to be considered in determining SIRVA damages, taking into account prior compensation determinations within SPU. I fully adopt and hereby incorporate my prior discussion in Sections I and II of *Timberlake v. Sec'y of Health & Hum. Servs.*, No. 20-1905V, 2025 WL 721730 at *1 – 3 (Fed. Cl. Spec. Mstr. Feb. 19, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[3]

---

[3] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

2

**III. Appropriate Compensation for Petitioner's Pain and Suffering**

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing the analysis in this case, I review the record as a whole to include the medical records, declarations, affidavits, and all other filed evidence, plus the parties' briefs and other pleadings. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

The medical records reflect that Petitioner was a generally healthy and retired 67-year-old widow, living with her son and grandchildren in Texas at the time she received the flu vaccine in her dominant right arm on September 16, 2022. Ex. 3 at 59. The vaccine was administered during a rheumatology appointment. *Id.*

Ten days later, on September 26, 2022, Petitioner reported post-vaccination acute pain (rated 4/10) and limited range of motion ("ROM") to a primary care provider ("PCP") – but no corresponding physical examination, assessment, or treatment plan was provided. Ex. 4 at 214 – 19, 228.

On October 12, 2022, Petitioner sought her rheumatologist's "urgent" evaluation of the right shoulder injury from the vaccination administered at that office. Ex. 3 at 75. The pain was severe, worse upon elevation, and only partially relieved by ibuprofen or topical Voltaren gel. *Id.* On exam, the shoulder had limited abduction (80 degrees) and pain with passive ROM. *Id.* at 76. The rheumatologist tentatively assessed that the vaccine had caused "new onset of rotator cuff tendinitis." The rheumatologist administered a steroid injection, encouraged "gentle stretching and avoid[ing] excessive activity," adding that Petitioner could consider formal physical therapy ("PT") if the steroid injection did not deliver improvement. *Id.* at 77.

On November 9, 2022, the rheumatologist ordered an MRI of Petitioner's right shoulder. Ex. 3 at 91. Once obtained on December 7, 2022, the MRI visualized a Type II B SLAP tear; partial tearing of the supraspinatus and subscapularis tendons; and mild tendinosis of the infraspinatus and biceps tendons. Ex. 5 at 124. The next day, the rheumatologist requested an orthopedic surgeon's consultation "for management of R right rotator cuff tear and tendinitis [which] has failed with cortisone injection." Ex. 6 at 44.

3

At the December 22, 2022 orthopedics initial evaluation,[4] Petitioner reported pain in her right shoulder since the flu shot three months prior. Ex. 6 at 31. She had trouble raising her arm and sleeping on the shoulder. *Id.* The cortisone injection had helped with "some" of her ROM but had not relieved her pain. *Id.*[5] Petitioner emphasized that the injury was to her dominant arm, and she wanted it fixed. *Id.* an exam found decreased ROM (active flexion 130 degrees; abduction 120; external rotation 80); positive Neers and Hawkins signs; and 4+/5 strength. *Id.* at 32 – 33. The orthopedist "believe[d] her best outcome would be with an arthroscopy with rotator cuff repair… lysis of adhesions and manipulation under anesthesia for superimposed adhesive capsulitis. She also potentially has a superior labral tear." *Id.* at 33. After being informed of the risks of surgery (including shoulder stiffness, infection, nerve or vessel injury, blood clot, anesthesia reactions, allergic reaction, and death), Petitioner elected to proceed to surgery, to be scheduled "as soon as possible." *Id.*

On January 12, 2023, Petitioner underwent several labs and an EKG in preparation for her surgery. Ex. 6 at 52 – 58. At a January 23, 2023 pre-surgical evaluation, Petitioner confirmed that her right shoulder pain was chronic, progressing, interfering with daily activity, and resistant to conservative treatment. Ex. 5 at 141. She was cleared for "major elective surgery with identified risk factors." *Id.* at 145.

On February 1, 2023, the orthopedic surgeon performed a right shoulder arthroscopic rotator cuff repair; superior labral, anterior labral, and chondral synovial debridement; and subacromial decompression." Ex. 5 at 230. The post-operative diagnoses were a "right shoulder rotator cuff tear with type 1 SLAP anterior labral tear as well as chondromalacia and capsulitis with impingement." *Id.* During the procedure, Petitioner had general endotracheal anesthesia and an interscalene block. *Id.* at 230 – 31. *Id.* She tolerated the surgery well, and went home the same day with her right arm immobilized. *Id.* at 232. She was also given a CryoCuff (cold therapy), a prescription for the pain medication Norco, and instructions for home exercises. *Id.* at 233.

By a February 16, 2023 orthopedics follow-up, Petitioner was doing well and was not taking pain medication. Her sutures were removed, and she was authorized to wean off the immobilizer and start formal post-operative PT. Ex. 6 at 60.

---

[4] Additionally on December 22, 2022, Petitioner underwent an x-ray of the left shoulder, with unremarkable findings. Ex. 3 at 134.

[5] On an orthopedics new patient questionnaire, Petitioner reported that her pain level varied. It was occasional, dull, aching, and throbbing. She had received some relief from heat therapy. Ex. 6 at 50.

At the February 24, 2023 PT initial evaluation, Petitioner's right shoulder pain ranged from 0 – 6/10 (aggravated by movement), her ROM was limited (active flexion 100 degrees, abduction 72, extension 55), and she had mild shoulder hiking at rest. Ex. 8 at 17 - 18. The therapist recommended services to reduce her pain and increase ROM, strength, posture, and functional mobility. *Id.* at 19.

The records of nine subsequent PT sessions, and an intervening orthopedics follow-up, reflect that Petitioner's pain with movement decreased to 2/10. She tolerated her exercises, made excellent gains in ROM, was sleeping well, and was pleased with her progress. *See generally* Ex. 8 at 38 – 126; Ex. 6 at 81 – 103.

At her tenth and last formal PT session on March 29, 2023, Petitioner reported 0/10 pain, except for stiffness after performing her home exercises. Ex. 8 at 114. Her right shoulder had normal ROM measures (active flexion 170 degrees, abduction 170, extension 65) and full strength. *Id.* at 115. She had achieved all goals, but was instructed to continue (unspecified) home exercises. *Id.* at 116.

At a final orthopedics follow-up appointment on April 25, 2023, Petitioner confirmed that her right shoulder had "no pain," and improved ROM and strength attributable to her PT. Ex. 6 at 105. After confirming those findings on exam, the orthopedist recommended that Petitioner "continue to work on range of motion and strengthening. Activities as tolerated. Did caution her against lifting more than 10 pounds shoulder height and above for the next 4 to 6 weeks." *Id.* at 106. No further records have been filed.

In April 2024, Petitioner confirmed: "I have experienced a significant recovery from my injury. While I continue to experience occasional pain in my right shoulder, the pain I experience is minor. Further, with some stretching and mobilization of my arm, the pain typically resolves." Ex. 1 at ¶ 25.

Petitioner argues that her past pain and suffering warrants an award of $108,000.00, particularly based on comparison to the prior reasoned decisions of *Selling*, *Meyers*, *Collado*, and *Knudson*. Brief at 16 - 27.[6] Respondent proposes a significantly lower award of $77,500.00 – maintaining that SPU has applied an undue premium on the mere occurrence of arthroscopic surgery while evaluating pain and suffering. Response at 7. Respondent "has not identified cases involving a surgical intervention that serve as

---

[6] Citing *Selling v. Sec'y of Health & Hum. Servs.*, No. 16-0588V, 2019 WL 3425224 (Fed. Cl. Spec. Mstr. May 2, 2019) (awarding $105,000.00 for past pain and suffering); *Vaccaro v. Sec'y of Health & Hum. Servs.*, No. 19-1883V, 2022 WL 662550 (Fed. Cl. Spec. Mstr. May 21, 2020) ($110,000.00); *Knudson v. Sec'y of Health & Hum. Servs.*, No. 17-1004V, 2018 WL 6293381 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) ($110,000.00); *Cates v. Sec'y of Health & Hum. Servs.*, No. 18-0277V, 2020 WL 3751072 (Fed. Cl. Spec. Mstr. June 5, 2020) ($108,000.00).

5

a direct comparison to this case," but contends that notwithstanding Ms. McClelland's surgery, her pain and suffering was limited and she achieved a very good recovery within seven months post-vaccination. Respondent also argues that Ms. McClelland's pain and suffering was less severe than that established in *Hunt* and her cited cases. *Id.* at 7 – 12.[7]

As explained at the April 30, 2025 hearing (and in many prior cases), awarding an amount for pain and suffering is an art and not a science. The parties should look to the general landscape of past pain and suffering awards, and specific past reasoned decisions that they believe to be directly "on point," when presenting their specific valuations of a case that is formally in damages. That information, when offered by the parties, can be highly useful in guiding my award (although a petitioner's personal circumstances are always the foundation of the award ultimately issued).

I also have routinely found that it is generally appropriate to start with a six-figure "baseline" for past pain and suffering for a SIRVA surgery case. Both medical providers' *recommendation* of surgery, and an individual's *acceptance* of that intervention (and its attendant risks), is one relevant measure of an injury's severity. I am not inclined to diverge from that baseline absent special circumstances and persuasive caselaw that supports a lower award.

Petitioner correctly notes that *Selling* "sets more of a floor than a ceiling for what damages should be" in a SIRVA surgery case. Brief at 16, quoting *Meyers v. Sec'y of Health & Hum. Servs.*, No. 16-0909V, 2020 WL 375535, at *4 (Fed. Cl. Spec. Mstr. June 5, 2020). In *Selling*, Special Master Oler recognized that the petitioner did not undergo "open and invasive surgery," but at the same time, the "necessity for general anesthesia indicate[d] great pain during his [comparatively less invasive] manipulation procedure." 2019 WL 3425224, at *6.

*Selling* is also roughly comparable to this case. The *Selling* petitioner had a significantly longer initial treatment delay (8 weeks, compared to 10 days for Ms. McClelland), which tends to suggest more manageable initial pain – notwithstanding his high pain ratings *after* seeking treatment, and difficulty continuing to serve as his wife's sole caregiver (Ms. McClelland has not shown comparable personal circumstances). The *Selling* petitioner's treatment course was longer (13 months, compared to 7 months for Ms. McClelland) because he and his providers tried conservative measures including PT *prior* to eventually resorting to surgery ten months post-vaccination. In comparison, on an orthopedist's advice, Ms. McClelland underwent surgery just four and one-half months post-vaccination. And while both petitioners underwent general anesthesia, Ms.

---

[7] Citing *Hunt v. Sec'y of Health & Hum. Servs.*, No. 19-1003V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr. June 16, 2022) (awarding $95,000.00 for past pain and suffering).

McClelland's surgery was more invasive – involving a rotator cuff tear, debridement, and decompression, and requiring subsequent immobilization and suture removal.

During the hearing, I took note of Respondent's argument that Ms. McClelland's SIRVA pain and suffering award should not compensate for surgical repair of "unrelated" pathology such as rotator cuff and SLAP tears. But in this case (as in many), that unrelated pathology appears to have been asymptomatic, and only discovered through the medical evaluation of the SIRVA (even though it is not evident that the rotator cuff and SLAP tears were "significantly aggravated" by the SIRVA). In essence, that additional pathology does not mean that the SIRVA pain and suffering award should be discounted.

Overall based on my review of this case and comparison to *Selling*, I find it appropriate here to award $105,000.00 for past pain and suffering.[8]

## Conclusion

For the foregoing reasons and based on consideration of the entire record, **Petitioner is awarded a lump sum of $105,000.00 (for past pain and suffering) to be paid through an ACH deposit to petitioner's counsel's IOLTA account for prompt disbursement.** This amount represents compensation for all damages that would be available under 42 U.S.C. § 300aa-15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[9]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[8] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[9] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.